**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PAPCO, Inc.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 08-253 Erie** |
| | ) | |
| **UNITED STATES OF** | ) | |
| **AMERICA and UNITED** | ) | |
| **STATES FOREST SERVICE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION

Pending before the Court is the Defendants' United States of America and the United States Forest Service's Motion to Dismiss Plaintiff's Second Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) (ECF No. 23), and Plaintiff PAPCO, Inc.'s Cross-Motion for Summary Judgment (ECF No. 29). PAPCO, which is in the business of oil and natural gas drilling, production, and related development activities, seeks to quiet title to its oil, gas, and mineral rights acquisition pursuant to the Quiet Title Act, 28 U.S.C. §2409a. Specifically, in Count I, PAPCO asserts that the Defendants are infringing on its ownership of sandstone located on tracts of land located within the Allegheny National Forest. In Count II, PAPCO claims that it has the right to the reasonable use of the surface estate by virtue of an easement incidental to its oil, gas, and mineral rights.

PAPCO initially filed a Complaint on September 9, 2008, followed by a Complaint that merely corrected typographical errors on September 23, 2008. On January 14, 2009, Defendants filed a motion to dismiss the Complaint. A briefing schedule was entered and briefs were filed by both sides. However, on March 4, 2009, PAPCO sought leave to file an Amended Complaint

(ECF No. 22), in part, to address some of the concerns raised by Defendants.  We permitted

PAPCO to file the Amended Complaint.  On March 25, 2009, Defendants again filed a motion to

dismiss (ECF No. 23).  Thereafter, the parties briefed the issues raised in the motion to dismiss.

In addition to opposing Defendants' Motion to Dismiss, PAPCO filed a Cross-Motion for

Summary Judgment (ECF no. 29) on April 24, 2009.  Briefing concluded in September 2009.

PAPCO filed notices of supplemental authority in February and March 2010 (ECF Nos. 43 &

45).

For the reasons set forth below we will grant summary judgment in favor of PAPCO.

I.      **Factual Background**

PAPCO owns oil, gas, and mineral ("OGM") rights for certain properties in the

Allegheny National Forest, while the Defendants own the corresponding surface estates.  Both

PAPCO's OGM rights and Defendants' surface estates arise from properties conveyed to the

United States by certain members of the Jamieson family.  The details of the conveyances

relevant to this case are as follows.

By deed dated March 10, 1930, the surface estate of certain real property located in

Warren County, Pennsylvania was conveyed by the Jamieson family to the United States (the

"Jamieson Deed"), pursuant to the Weeks Act, 16 U.S.C. §§515-21 (1976).  Jamieson Deed,

attached as Ex. A of Am. Compl.  The Jamieson Deed was recorded in the Warren County

Recorder's Office in Book 168, Page 433 on May 20, 1930.

PAPCO acquired certain oil, gas, and mineral rights reserved by the Jamieson Deed by

deeds dated November 9, 1990, June 29, 2001, and August 24, 2001.  Attached as Ex. B. to Am.

Compl.  The specific parcels of real property for which PAPCO purchased the OGM rights that

fall under the Jamieson Deed are Warrants 2428, 2590, 2978 and 2674, Lots 14, 17, 18, 43, 44,

45, 48 and 61, and Tracts 42, 44, 47 and 49. The PAPCO Deeds were recorded in the Warren County Recorder's Office in Book 329, Page 34, Book 1075, Page 206, and Book 1082, Page 61.

Under the Weeks Act, the Secretary of Agriculture was authorized to "identify and purchase certain lands for the purpose of promoting or protecting the navigation of streams and promoting the production of timber." 16 U.S.C. §§515, 516. The United States purchased only the surface estates pursuant to the Jamieson Deed, which reserved oil, gas, and mineral rights subject to specific restrictions. Specifically, the relevant section of the deed states:

> This conveyance is made subject to all oil, gas and mineral rights, and rights of way incidental to such oil, gas and mineral rights outstanding of record, and to defined rights of way.
>
> The parties of the first part hereby except and reserve from and out of this conveyance unto themselves, their successors, heirs and assigns, *all the oil, natural gas, glass sand and minerals of every kind and description whatsoever, together with the rights of egress, ingress, and regress into, upon and from the same at all times for the purpose of exploring, operating for, producing, storing and transporting the same*; also all rents and royalties, whether in cash or in kind, under any and all existing leases or similar agreement for the extraction of oil, gas, sand and other minerals from the said premises; also any and all springs of a certain kind commonly called "paint springs", situate [sic] upon such premises, and the water, fluid, paint or paint-like material (whether mud, clay, mineral or other similar substance), springing or to be obtained or produced from said paint springs or from the immediate vicinity thereof; . . . .

Jamieson Deed at 438-439 (emphasis added).

The exercise of the reserved oil, gas, and mineral rights under the Jamieson Deed is subject to the regulations of the Secretary of Agriculture as stated in the Jamieson Deed. Specifically, pursuant to Section 9 of the Weeks Act, the Jamieson Deed set forth the following "Rules and Regulations prescribed by the Secretary of Agriculture:

1. Every person claiming the right to prospect for minerals, oil or gas, or the products thereof, or to mine, drill, develop or operate in or upon lands acquired by the United States under the provisions of the Act of March 1, 1911 (36 Stat. 961), with a reservation to the grantor of mineral rights, including oil and gas, must, on

demand, exhibit to the Forest Officer in charge satisfactory written evidence of the right or authority from, through or under the said grantor.

2. In prospecting for, and in mining and removing minerals, oil and gas, and in manufacturing the products thereof, only so much of the surface shall be occupied, used or disturbed as is necessary for the purpose.

3. In underground operations all reasonable and usual precaution shall be made for the support of the surface and to that and tunnels, shafts and other workings shall be subject to inspection and examination by the Forest Officers, Mining Experts or Inspectors of the United States.

4. Payment of the usual rates charges in the locality for sales of National Forest timber, and timber products of the same kind or species shall be made to the United States for all timber, undergrowth or young growth, cut, destroyed or damaged in prospecting, mining, drilling or removing minerals, oil or gas, or in manufacturing products therefrom, and in the location and construction of buildings or works of any kind for the use in connection therewith.  All slash resulting from such cutting or destruction shall be disposed of as directed by the Forest Officer, when inflammable in his judgment.  No timber, undergrowth or reproduction shall be unnecessarily cut, destroyed or damaged.

5. All buildings, camps, equipment and other structures shall be removed from the Forests within six months after the completion or abandonment of the operations, otherwise such buildings, camps, equipment and other structures shall become the property of the United States.

6. All destructible refuse caused by the operations hereunder, which interferes with the administration of the forest growth shall, within six months after the completion of said operations, be disposed of.

7. While operations are in progress, the operators, contractors, and subcontractors and employees of contractors and subcontractors at work on the National Forest shall use due diligence in the prevention and suppression of fires, and shall be available for service in the extinguishment and suppression of all fires within the particular locality.

Jamieson Deed at 439.

Thus, the United States and the Forest Service own the surface estates of certain

properties while PAPCO owns the reserved OGM rights within these same properties.  The issue

is who owns the sandstone.  PAPCO maintains that the sandstone is a "mineral" within the OGM

reservation of the Jamieson Deed.  The Defendants argue that the sandstone is part of the surface

estate, or in the alternative that the Forest Service asserted its interest in the sandstone as early as late 1990, and therefore PAPCO is now barred by the statute of limitations (twelve years by the terms of the Quiet title Act, 28 U.S.C. § 2409a(g)) from bringing this lawsuit. Defendants rely on several different documents produced in 1990 and 1991, as well as two general Forest Service publications, in support of their argument that the Forest Service asserted an adverse claim to the sandstone in late 1990.

PAPCO places stone on oil and gas access roads and well sites within the Allegheny National Forest to stabilize the areas and for erosion and sedimentation control, and has removed stone from the Jamieson Tract. The term "stone" is also commonly referred to as "shale" and "sandstone." PAPCO asserts that sandstone for road surfacing increases weight bearing capacity of the roads, reduces road maintenance, increases traction, and preserves vehicles and equipment. The use of stone for access road surfaces is a common and accepted practice within the Allegheny National Forest. Sandstone is typically removed by surface mining, which involves the removal of the soil and vegetation above the stone by a bulldozer or excavator.

The Forest Service developed a 1.3 acre stone pit in 1991 on Lot 45 in Warren County as part of the Forest Service's "West Wind Project." PAPCO owns the reserved OGM rights pursuant to the Jamieson Deed for Lot 45. At the time of its acquisition, PAPCO had a title search performed, which did not reveal an adverse interest in the sandstone or in other minerals, or otherwise indicate a cloud on the title to the oil, gas, and mineral rights of any of its properties acquired under the Jamieson OGM reservation.

On February 7, 2007, representatives of PAPCO discovered an unauthorized stone pit on Lot 14, one of the properties under the Jamieson Deed when it received a survey map provided by the U.S. Energy Development Corporation. Thereafter, PAPCO contacted the Forest Service

by letters dated February 22, 2007 and April 2, 2007, inquiring about the unauthorized pit on the Lot. By letter dated September 27, 2007, the Forest Service informed PAPCO that it was the Forest Service's position that the sandstone was owned by the Federal Government. On November 2, 2007, the Forest Service sent PAPCO two "Southwest Reservoir Project Area" testing maps that identified a number of test pits associated with the Forest Service's plans for stone exploration on property in the chain of title of the Jamieson Deed. And on November 5, 2007, PAPCO responded by letter advising the Defendant Forest Service that it did not own the mineral rights or have the right to explore for minerals on PAPCO properties.

By letter dated November 23, 2007, PAPCO's legal counsel asserted PAPCO's claim of ownership to the OGM rights on the relevant properties by virtue of the Jamieson Deed, that it owned the sandstone, and that the Forest Service does not have the right to explore for, mine, or use the sandstone. By letter dated December 18, 2007, the Office of General Counsel for the United States Department of Agriculture informed PAPCO of his opinion that the reservation in the Jamieson Deed did not include sandstone, that sandstone is part of the Forest Service's surface estate, and that PAPCO should avail itself of the Quiet Title Act if it wished to assert ownership. As noted, on September 9, 2008, PAPCO instituted this lawsuit.

## II. Standard of Review

Defendants have filed a motion to dismiss pursuant to Federal Rules of Procedure 12(b)(1) and 12(b)(6). Defendants first argue that this Court lacks subject matter jurisdiction under Rule 12(b)(1) over PAPCO's claims for failure to file within the applicable statute of limitations. In the alternative, Defendants seek dismissal of PAPCO's claims for failure to state a claim upon which relief can be granted under Rule 12(b)(6).

PAPCO argues that we should treat Defendants' jurisdictional challenge under the summary judgment standard characterizing it as a "speaking" motion to dismiss. We disagree. As explained below, Defendants' challenge is properly considered under Rule 12(b)(1).

PAPCO not only responded to Defendants' Motion to Dismiss, but also filed its own motion seeking judgment as a matter of law. PAPCO argues that we should treat Defendants' motion to dismiss Counts I and II pursuant to Rule 12(b)(6) as a motion for summary judgment, in part, because Defendants have attached material that goes beyond the Complaint. We agree; Defendants have presented matters outside the pleadings, and we will not exclude them. Fed.R.Civ.P. 12(d). Our review of the parties' numerous briefs convinces us that all parties have been given a reasonable opportunity to present all pertinent material and therefore we will treat Defendants' motion to dismiss as a motion for summary judgment. Fed.R.Civ.P. 12(d).

### A. Rule 12(b)(1)

With regard to Rule 12(b)(1), the United States Court of Appeals for the Third Circuit has explained that such a motion raises the issue of "'the trial court's jurisdiction--its very power to hear the case.'" Robinson v. Dalton, 107 F.3d 1018, 1021 (3d Cir. 1997), quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir.1977). A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff. In reviewing a factual attack the court may consider evidence outside the pleadings. Gould Electronics Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000), citing Mortensen, 549 F.2d at 891 (other internal citations omitted).

Defendants are asserting a factual challenge. The United States Court of Appeals for the Third Circuit has "explained that in such a circumstance, a trial court 'is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" Robinson, 107 F.3d at 1021, quoting Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc., 673 F.2d 700, 711 (3d Cir.1982). "'[N]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.'" Robinson, 107 F.3d at 1021, quoting Mortensen, 549 F.2d at 891.

While jurisdiction in this case is based upon the Quiet Title Act, 28 U.S.C. §2409a, jurisdiction must also be evaluated upon the statute of limitations requirement set forth in the act in §2409a(g). The Defendants argue, and we agree, that because the "Quiet Title Act represents a limited waiver of the sovereign immunity of the United States, the statute of limitations is a jurisdictional prerequisite to suit." Defs.' Br. Supp. 7. As such, "'the running of a statute of limitations on an action does not provide the Government with a waivable defense; it deprives the court of jurisdiction.'" Defs.' Reply 4, quoting Deakyne v. Dep't of Army Corps of Engineers, 701 F.2d 271, 274, n.4 (3d Cir. 1983).

When federal sovereign immunity from suit is waived by Congress, "the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." Forman v. United States, 1999 WL 793429, *7 (E.D. Pa. 1999); see also United States v. Dalm, 494 U.S. 596 (1990); United States v. Sherwood, 312 U.S. 584, 586 (1941). As such, a statute of limitations is such a term that defines a court's jurisdiction. Dalm, 494 U.S. at 608; see also United States v. Mottaz, 476 U.S. 836, 841 (1986) (statute of limitations is a condition of waiver of sovereign immunity); Block v. North Dakota, 461 U.S. 273, 287 (1983) ("When waiver

legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity"). Thus, the statute of limitations provision in the Quiet Title Act, §2409a(g), defines jurisdiction. As such, in regards to the issue of whether PAPCO's Complaint is barred by the Quiet Title Act's statute of limitations, we will proceed under the procedure set forth for a 12(b)(1) motion.

## B. Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A).

In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986); Huston v. Procter & Gamble Paper Prod. Corp., 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986); Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir.2004); Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir.1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48 (1986). An issue is "genuine" if a reasonable jury could possibly hold in the

nonmovant's favor with regard to that issue. Id. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587; Huston, 568 F.3d at 104.

### III. Discussion

We will first address whether PAPCO's complaint is time-barred by the 12-year limitations period set forth in the Quiet Title Act.

### A. PAPCO's Complaint is Not Barred by the Statute of Limitations

Defendants first argue that we lack jurisdiction over PAPCO's claims because the claims are barred by the applicable 12-year statute of limitations. The Quiet Title Act's limitations period, set forth in §2409a(g), states in relevant part:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. 2409a(g) (1986). The Quiet Title Act represents a limited waiver of sovereign immunity, thus the statute of limitations is a jurisdictional prerequisite that must be strictly construed in favor of the sovereign, the United States. Block v. North Dakota, 461 U.S. 273, 282 (1983).

In a statute of limitations inquiry the crucial issue is "whether the plaintiff had notice of the federal claim." Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 769 (4th Cir. 1991). "'Knowledge of the claim's full contours is not required,'" and the United States does not need to provide explicit notice. Rio Grande Silvery Minnow v. Bureau of Reclamation, 599 F.3d 1165, 1176 (10th Cir. 2010), quoting Knapp v. United States, 636 F.2d 279, 283 (10th Cir. 1980). Rather all that is necessary for accrual is "a reasonable awareness that

the Government claims some interest adverse to the plaintiff's." Knapp, 636 F.2d at 283; see also Richmond, 945 F.2d at 770. The statutory language "should have known" imparts a test of reasonableness, and crucial question is: "[W]hether the United States' action would have alerted a reasonable landowner that the Government claimed interest in the land." Shultz v. Dep't of Army, 886 F.2d 1157, 1160 (9th Cir. 1989).

The Government's claim does not need to be clear and unambiguous, and accrual is not "'dependent on the plaintiff knowing the precise nature of the property interest upon which the United States predicates its claim of title.'" Rio Grande Silvery Minnow, 599 F.3d at 1176, quoting Spirit Lake Tribe v. North Dakota, 262 F.3d 732, 738 (8th Cir. 2001). Even an invalid claim or a claim that does not amount to full legal title will trigger the Quiet Title Act's limitations period. Id. For "as long as the [United States'] interest claimed is a 'cloud on title,' or a reasonable claim within a substantial basis, it constitutes a 'claim' for purposes of triggering the twelve-year statute of limitations." Richmond, 945 F.2d at 769.

Defendants argue that PAPCO should have known that the United States, as surface owner, claimed an interest in the sandstone on the disputed parcels because in 1991 the Forest Service developed a 1.3 acre stone pit on Lot 45, from which stone had been extracted. Defs.' Br. Supp. 11. This is the sole overt act upon the land that Defendants point to in support of their argument. Defendants make no claim that they had physically entered onto any of their surface estates to assert an adverse interest to the sandstone located in Warrants 2428, 2590, 2978, or 2674, Lots 14, 17, 18, 43, 44, 48, or 61 and Tracts 42, 44, 47, or 49. The remainder of Defendants' argument relies on the Forest Service's internal documents, publically available documents, and legal notices published in two local newspapers. As explained below, we find that the evidence in the record did not create a reasonable awareness of Defendants' interest in

the sandstone such that PAPCO should have known of the adverse interest in 1991 or at any time prior to September 8, 1996, which was 12 years before this suit was filed.

Defendants submit the following chronology of events in support of their motion. On November 15, 1990, the Forest Service investigated the potential for developing a "Rock Pit" in the area of "F.R. 263A" by excavating eight test holes to determine if there was suitable material for a stone pit. "'Westwind' Timber Sale, F.R. 263A → Proposed Rock Pit Recon", Handwritten Memo from L. Sperry to Henry Hus, Nov. 15, 1990, Attachment 2 to Declaration of Frank Daniel Salm, PE, March 17, 2009 (Ex. C to Defs.' Br. Supp.); and Defs.' Br. Supp. n.2. Defendants explain that "F.R. 263A" "is a Forest Service road that was constructed to provide access within Lot 45." Defs.' Br. Supp. n.2. There is no explicit indication in this document that a stone pit would be opened on Lot 45.

On December 6, 1990, the Forest Service Supervisor's Office sent an internal communication to the Bradford District Ranger in the Allegheny National Forest titled "Westwind Timber Sale Transportation Analysis: Amendment # 1." Attachment 3 to Ex. C to Defs.' Br. Supp. As the title suggests, the document consists of analysis related to access to logging within the area where proposed timber sales would occur. As part of the analysis, the author indicates that a new road, F.R. 263A, should be constructed to provide logging access to certain areas. Id. at 2. The author indicates that a new "rock pit" to provide "aggregate surfacing material" to construct F.R. 263A (and for other roads) will be needed. Id. at 3. In this regard the author states as follows:

> The recommended location for a new rock pit is at approx. Sta. 14+40 of proposed FR 263-A. This area was explored with a backhoe and the test holes exhibited approx. 18,500 c.y. of rock that could be utilized for TSL-D road surfacing.

Id.  Attached to the communication is a photocopy of a map with extensive handwritten markings, including an arrow indicating that a "Proposed Pit" was to be located within Lot 46, very near to Lot 45.  Id. at 4.

On January 4, 1991, the Forest Service issued a "Decision Notice and Finding of No Significant Impact" for the "West Wind Project Area," authored by Corbin L. Newman, Jr., the District Ranger for the Bradford Ranger District.  Attachment 4 to Ex. C.  Mr. Newman states in the opening "Decision" section of this document that "[b]ased on the Environmental Assessment for this project, it is [his] decision to adopt Alternative 1 which proposes a variety of resource management treatments within 1902 acres of National Forest land."  Id. at 1.  The "treatments" include clearcutting, commercial thinning, shelterwood seedcut, herbiciding, fencing, hemlock improvement cut, and selection cutting.  Id.  The District Ranger, Mr. Newman, also indicates that "wildlife management objectives" will be met through "timber management."  Id.  With regard to roads he states that "[c]onstruction of new low standard roads will total 3.3. miles, and 0.2 miles of low standard roads will be reconstructed."  Id.  Mr. Newman concludes the short "Decision" section of this document as follows:

> The West Wind Project will be the primary means of accomplishing the proposed timber and wildlife management treatments, and the road construction.  The land involved is located in Warrants 2590 and 2674, and Lots 42-47, 62-64, and 70-71 of Mead Township of Warren County; and Warrant 2429 and Lot 65 of Hamilton Township, McKean County.  The Environmental Assessment is available for public review at the Forest Service Office in Marshburg, Pennsylvania.

Id.

With regard to the removal of stone, in the "Finding of No Significant Impact" section, Mr. Newman cites as one of seven factors supporting his determination that an environmental impact statement is not needed, the following:

2) An irreversible resources commitment is recognized with the removal of stone
from pits on Forest Service land.

Id. at 3.   The document concludes by noting that the project may begin within seven days after

publication of "this notice" in the Bradford Era and that the decision is subject to an appeal

pursuant to 36 CFR 217.8.

On January 7, 1991, the Forest Service issued a "Legal Notice" to local newspapers

indicating that on January 4, 1991 Mr. Newman had made the "decision to proceed with the

West Wind project which includes harvesting timber on 385 acres with associated road

construction and reconstruction."  "Legal Notice," USDA Forest Service, Jan. 7. 1991,

Attachment 5 to Ex. C.  The Notice also indicates that "Selected stands will receive treatments

with herbicide and fencing to promote and protect new forest stands" and that "[s]everal wildlife

habitat improvements will be incorporated."  Id.  The Notice further notes that the "project is

located in Hamilton Township, McKean County, PA, and Mead Township, Warren County, PA"

and that the "associated Decision Notice is available upon request from the Bradford Ranger

District."  Id.

The Notice was published under the heading "Legal Notice" in The Bradford Era

newspaper on January 7, 1991, and under the heading "Forest Service makes Decision" in the

Warren Times Observer newspaper on January 8, 1991.  Id.  The Legal Notice was published "as

required by 36 C.F.R. Part 215."  Ex. C to Defs.' Br. Supp. at ¶9.

Mr. Newman refers to an Environmental Assessment in his "Decision" and notes that it is

"available for public review."   Attachment 4 at 1.   An Environmental Assessment is a public

document that aids an agency's compliance with the National Environmental Policy Act, and

provides evidence to support an agency's decision either to prepare an environment impact

statement or issue a finding of no significant impact.  36 C.F.R. § 215.2.   Under the "Affected

Environment" Section in Part III, Section A. "Physical Environment" of the Environmental

Assessment, the following relevant information is set forth:

1. Minerals/Geology

A. Energy Minerals
    …

B. Hard Rock Minerals
An old gravel pit currently exists along FR 263, which has been evaluated to
determine remaining reserves of pit-run stone. The pit does not contain enough
stone to surface the proposed roads in either alternative 1 or 2. After the
remaining stone is used, a new pit area will be opened, which has been identified
in the project area near the PGC food plot (see map).

Environmental Assessment for West Wind Project at 2, Attachment 8 to Ex. C. Two

photocopied maps are attached to the Environmental Assessment, one for "Alternative 1" and

one for "Alternative 2." Id. at 3, 4. Both maps are heavily annotated with handwriting,

including a "Legend," which identifies a square symbol to indicate a "new stone pit." In our

opinion extensive handwriting on the maps creates a confusing and difficult to interpret map, but

it does appear that a square is located within Lot 45 on these maps.

The West Wind Timber sale took place in 1991. Ex. C at ¶ 13. The "West Wind Timber

Sale" document includes a photocopy of a map. Attachment 9 at 2 to Ex. C. A handwritten

triangle symbol labeled "PIT SITE" indicates that the pit is located in Lot 46, although a

miniscule part of the lower right hand angle does touch Lot 45. Id.

Defendants also point to the "widely distributed" publically available 1986 Land and

Resource Management Plan for the Allegheny National Forest. Attachment 6 to Ex. C.

Specifically, Defendants point to Chapter 3 "Plan Response to Management Problems" under

section C "Research Needs" which describes a "Problem Statement and Background" as follows:

FACILITIES

8. From what source and by what means will the ANF secure its stone needs for future road construction/reconstruction projects?

Background: The ANF conducts a large annual road construction/reconstruction program. One of the primary raw materials is stone/crushed rock. Presently, these needs are being met through a scatter array of stone pits. Conventional extraction involves removal of the softer, upper layers of sandstone.
. . .

Id. at p. 3-14. Defendants also cite to a portion from Chapter 4 "Management Direction" under section C "Forest-wide Direction" as follows:

Mineral Materials (stone and gravel)
. . .

The ranking for allocations of rock from National Forest lands will be (1) for Forest roads and trails and for exercise of valid private mineral rights on National Forest land.

Id. at p. 4-46.

Finally, Defendants point to the Allegheny National Forest Handbook for Oil and Gas Administration, which has been available to oil and gas operators since the 1980's, upon request. Defs.' Br. Supp. 14; Ex. C at ¶ 10. Under the "Construction Standards" section of the Handbook the following information concerning Road Surfacing is stated:

7. Surfacing. . . .

Ideally, surfacing material should be obtained from a pit in close proximity to the oil and gas development. If an existing pit is available, it should be used rather than opening up a new pit. It is the policy of the Allegheny to provide surfacing material for use on National Forest land, provided it has not been obligated to other Forest activities. . . .

Handbook for Oil and Gas Administration at 4, Attachment 7 to Ex. C.

Defendants conclude that "[b]ased upon [the above] publically available information" PAPCO should have known that when the United States "developed a stone pit on one of the

16

Jamieson Deed Properties in 1990 and 1991," it was "asserting an interest adverse to PAPCO with respect to the ownership of the stone on [all] the Disputed Parcels" contained in Warrants 2428, 2590, 2978, 2674; Lots 14, 17, 18, 43, 44, 45, 48 and 61; and Tracts 42, 44, 47, and 49. Defs.' Br. Supp. 14.

We disagree. In essence Defendants' argument is based on two pieces of weak evidence: the Legal Notice published in the two local newspapers, and the fact that a stone pit was opened on Lot 45 in 1991. While Defendants also argue that PAPCO should have known of Defendants' adverse interest in the sandstone based upon the other identified documents, the only reason PAPCO would have cause to examine such documents is if the Legal Notice first alerted PAPCO that Defendants were claiming an adverse interest in its sandstone. Because we find that the Legal Notice did not alert PAPCO, Defendants cannot rely on the other documents to support their argument that PAPCO should have known of Defendants' adverse interest. The remaining documents are also insufficient as a means of establishing that a mineral rights owner should have known of Defendants' adverse interest in the sandstone.

### 1. The Published Legal Notice

While the United States is not required to provide explicit notice of its claim, and "knowledge of the claim's full contours is not required," Knapp, 636 F.2d at 283, we find that the Legal Notice did not create a reasonable awareness of Defendants' adverse interest in the sandstone, nor would it serve to alert a reasonable OGM rights owner of the United States' interest in sandstone. The Notice simply informed the public of the "decision to proceed with the West Wind project which includes harvesting timber on 385 acres with associated road construction and reconstruction." Attachment 5 to Ex. C. It also makes reference to herbicide treatments, protection of new forest stands, and wildlife habitat improvements. Id. Notably

absent from this Notice is any mention of opening a stone pit. Finally, the Notice's explanation of the location of the above activities is stated as generally occurring in two townships with no more specific delineation of the location of any of the activities, much less any activity that would suggest that the Forest Service is asserting an adverse interest in any mineral owner's rights. Id.

In addition, pursuant to the National Environment Protection Act, the Forest Service was required to publish the Legal Notice. See 36 C.F.R. § 217.5(c) (the applicable section at the time of publication). The Legal Notice simply provided the information it was required to give under the law. Moreover, we agree with PAPCO's characterization of the notice as informing the public of activities that the surface owner of the properties has a "legal right and ability to undertake without creating any adverse [e]ffect or interference with mineral rights." Pl.'s Br. Opp. 14. In addition, the Forest Service concedes that "the notice did not include activities associated with road construction including: clearing and grubbing, excavation, surfacing, culvert installation, pit development, signing, etc." Ex. C to Defs.' Br. in Supp. at ¶9.

We therefore find that the Legal Notice was insufficient to alert PAPCO or any other reasonable mineral owner that Defendants were asserting an adverse interest in sandstone.

### 2. Defendants' Other Documents

Defendants also rely on the following other documents: Westwind Timber Sale Proposed Rock Pit Reconnaissance document, the Westwind Timber Sale Transportation Analysis, the Decision Notice and Finding of No Significant Impact for the West Wind Project, the Environmental Assessment for West Wind Project, the West Wind Timber Sale document, the 1986 Land and Resource Management Plan for the Allegheny National Forest, and the Handbook for Oil and Gas Administration. Since the Legal Notice did not alert PAPCO of

Defendants' adverse interest, there is no basis upon which we can find that PAPCO should have conducted further investigation to retrieve the above documents. However, the contents of these documents demonstrate that they are also insufficient as a means of establishing that a reasonable mineral rights owner should have known of Defendants' adverse interest in sandstone.

While Defendants argue that the documents, in part, show that the Forest Service was expressly indicating its intention to open a stone pit on Lot 45, there is only one document that might indicate that a stone pit was to be located on Lot 45, and even that document is less-than-persuasive. The Westwind Timber Sale Proposed Rock Pit Reconnaissance handwritten document gives no affirmative indication that "Lot 45" is the area where the investigation is occurring, nor does the author indicate by typical boundary description that the property is Lot 45. Similarly, there is no affirmative identification of Lot 45 in the "Westwind Timber Sale Transportation Analysis: Amendment # 1" document. Moreover, the poorly reproduced map attached to this document includes a handwritten arrow that appears to be indicating a proposed pit on Lot 46, not Lot 45. The Decision and Finding of No Significant Impact at least includes mention of Lot 45 in its list of Warrants and Lots involved in the West Wind Project. However, as noted this legally required internal document overwhelmingly concerns typical activities of a surface owner.

Perhaps Defendants' best evidence is the maps attached to the Environmental Assessment, because although they too are heavily annotated and difficult to interpret they at least provide an indication with a square symbol that a new stone pit is meant to be located on Lot 45. However, adding to the difficulty in deciphering these maps is that the Legend on both maps also includes a symbol (a series of three squarish or rectangular blocks) similar enough to the square used for the new stone pit to create confusion rather than alert a reasonable mineral

rights owner of an adverse interest.  To make matters worse, the map attached to the West Wind

Timber Sale document uses a handwritten triangle symbol (instead of a square) to indicate that

the pit is located in Lot 46 (instead of Lot 45).

The 1986 Land and Resource Management Plan also did not create a reasonable

awareness of Defendants' adverse interest in sandstone.  The portions of this document relied

upon by Defendants identify the need for research into the extraction means of stone and the

types of sources to obtain stone, and an indication that the Forest Service will make stone

available for use by private mineral rights owners before off-forest uses.  In a portion of the

Forest Plan not quoted by Defendants it states that "The Forest Service will protect the rights of

the federal government [and], *respect private mineral rights*."  1986 Land and Resource

Management Plan at p. 4-43 (emphasis added) (attached to Ex. A to Pl.'s Br. Opp.).  A

reasonable mineral rights owner would be justified in interpreting this language as an assurance

that their mineral rights are not at risk.

Similarly, the quoted section of the Oil and Gas Handbook relied upon by the Defendants

is best described as a policy directing that stone used for surfacing material be obtained from pits

located in close proximity to oil and gas development, and that such stone will be supplied if

needed.  This section does not suggest that the government will claim ownership of the sandstone

located on Lot 45 or on the other properties.  Instead, a reasonable mineral rights owner could

interpret this section as the Forest Service using government-owned stone as a way of

implementing its policy, not as an adverse claim.

Thus, even if we were to determine that the Legal Notice was sufficient and should have

alerted PAPCO of a claimed adverse interest thereby requiring PAPCO to conduct further

inquiry and obtain the above-mentioned documents, we would not find that the additional documents were sufficient to put PAPCO on notice of the adverse interest.

### 3. The Stone Pit on Lot 45

We turn now to the presence of the 1.3 acre stone pit on Lot 45. Our understanding of Defendants' argument is that they do not rely on the presence of the pit as a sole evidentiary basis for finding that PAPCO should have known of the adverse claim to the sandstone. Instead, Defendants' argument is based on the combination of documentary evidence along with the presence of the stone pit. See Defs.' Br. Supp. 14 ("Based upon publically available information, together with pit development and mining activities on Lot 45 since 1990, plus the physical presence of a 1.3 acre stone pit on the land since 1991, Plaintiff knew or should have known" of the adverse claim); Defs.' Reply 6 ("Defendants demonstrated that Plaintiff should have known of the United States' interest based on publically available information, together with pit development and mining activities on Lot 45 since 1990, plus the physical presence of a 1.3 acre stone pit on the land since 1991"); and 9 ("In short, publically available information, together with pit development and mining activities on Lot 45 since 1990, plus the physical presence of a 1.3 acre stone pit on the land since 1991, establish that Plaintiff should have known of the United States' interest in the stone on the Disputer Parcels more than twelve years prior to the filing of this lawsuit").

Since we have found that the "publically available information" was insufficient to alert a reasonable mineral rights owner that Defendants were asserting an adverse interest in the sandstone, Defendants' entire argument fails unless they can establish that PAPCO had actual knowledge of the stone pit and related mining activities or that PAPCO should have known of the stone pit and mining activities. However, Defendants do not argue that PAPCO had actual

knowledge.  The only argument they proffer is that because PAPCO claims it owns mineral

rights (as well as oil and gas rights) its failure to conduct periodic inspections of its property is

unreasonable.  Defs.' Reply 8.  Defendants offer no support for this assertion.

In contrast, PAPCO has explained that when it purchased the oil, gas, and mineral rights

it had a title search performed, which did not reveal an adverse interest in the subsurface stone or

other minerals or otherwise indicate a cloud on the title to the oil, gas, and mineral rights.

Because the nearly 12,000 acres of property  covered in PAPCO's purchase of the oil, gas, and

mineral rights in this case were acquired for long-term development, PAPCO does not conduct

periodic property inspections or have an ongoing presence on the property.   The actual area

covered by the 1.3 acre stone pit only amounts to 0.52% of Lot 45's total surface area of 250

acres.   Under these circumstances we find that a reasonable mineral rights owner would not

have felt the need to conduct periodic inspections of their property.

The cases relied upon by Defendants, Knapp v. United States, 636 F.2d 279 (10th Cir.

1980) and Spirit Lake Tribe v. North Dakota, 262 F.3d 732 (8th Cir. 2001), are distinguishable

from the present case.

In Knapp, after examining the relevant deeds an oil company representative told plaintiffs

in 1958, approximately 19 years before they filed suit, that "some of the land they thought they

owned appeared to belong to the Federal Government."  Id. at 281.  Unlike the plaintiffs in

Knapp, no one told PAPCO prior to 2007 that it appeared that Defendants' claimed an adverse

interest in any portion of their properties.

In Spirit Lake Tribe, the plaintiff Tribe asserted that it had title of disputed lake property

pursuant to an 1867 treaty.  262 F.3d at 736.  The government argued that the disputed property

was not included in the 1867 treaty, and in any event the United States acquired a portion of the

property from North Dakota in 1971 through a quitclaim deed.  Id.  The purpose of the United States' 1971 acquisition was the construction of a massive public works project called the Garrison Diversion Unit.  Id.

In finding that the Tribe knew or should have known of the government's adverse claim to the disputed property in 1971, the Spirit Lake Tribe Court noted that that the 1971 land acquisition was widely reported by the media.  Id. at 738.  In addition, the Court described the Garrison Diversion Project as "the single most important, visible public works project in North Dakota in the last half of the 20th century," and as such the "Tribe could hardly have turned a blind eye to its major details."  Id.  Moreover, the Court stated that the Tribe apparently had actual knowledge that the government acquired the land based on "a 1970 tribal resolution expressing concern about land ownership in view of 'the coming Garrison Diversion Project'" Id.  Thus, the Court concluded that it had "little doubt that the Tribe was aware of the Garrison Diversion Project generally, and the government's acquisition of a portion of the lake specifically."  Id.

In contrast, in this case there was no wide media reporting about Defendants' opening a 1.3 acre stone pit and its related mining activities in late 1990 or 1991.  There was no overwhelming public information from which PAPCO could have turned a blind eye. Moreover, the stone pit was at best a minor aspect of the West Wind Project, and stone pit activities were not a central goal or purpose of the project.  Finally, there is no record evidence to show that PAPCO had any actual knowledge of the stone pit and related mining activities until 2007.

### 4. Conclusion

We conclude that PAPCO did not learn of a possible adverse claim against its subsurface sandstone until February 7, 2007, when it received a survey map from the U.S. Energy Development Corporation regarding stone located on Lot 14.   In response, PAPCO promptly inspected its other lots and during that process learned of the existence of a stone pit on Lot 45. Thereafter, PAPCO sought further information from the Forest Service, which finally affirmatively stated an adverse claim to the subsurface stone on properties in the chain of title of the Jamieson Deed on December 18, 2007.  Thus, it is clear that PAPCO filed the instant lawsuit well-within the applicable 12-year statute of limitations.

For the above reasons we hold that the statute of limitations was not triggered in 1991. Thus, PAPCO's claim is not barred by the Quiet Title Act's statute of limitations, and this Court does have subject matter jurisdiction to proceed with this case.  Accordingly, we will deny Defendants' Motion to Dismiss pursuant to 12(b)(1) to the extent that it is based on the argument that the complaint is time-barred by the Quiet Title Act's statute of limitations.

### B.  Sandstone is within the Scope of the Mineral Reservation

The Jamieson Deed created a broad mineral reservation that extended to "all the oil, natural gas, glass sand and minerals of every kind and description whatsoever."  Jamieson Deed at 439.  PAPCO argues that under Pennsylvania law, this reservation includes sandstone that is extracted for commercial purposes.  In response, Defendants argue that the sandstone was not included in the mineral reservation.

In construing a mineral reservation taken as part of a Weeks Act land transaction, we look to the law of the state in which the land is located.  *See* Belville Mining Co. v. United States, 999 F.2d 989 (6th Cir. 1993) ("The validity of [Plaintiff's] assertion that a right to strip

mine coal was included in its bundle of reserved rights must be determined under Ohio law");

United States v. Stearns Coal & Lumber Co., 816 F.2d 279 (6th Cir. 1987) (in regards to the

issue of whether the plaintiff may engage in strip mining, the law of Kentucky is controlling).

Under Pennsylvania law, when analyzing a deed, it is the intention of the parties that controls.

Stewart v. Chernicky, 266 A.2d 259, 263 (Pa. 1970); see also New Charter Coal Co. v. McKee,

191 A.2d 830 (Pa. 1963); Mt. Carmel R.R. Co. v. M.A. Hanna Co., 89 A.2d 508 (Pa. 1952);

Gibson v. Tyson, 5 Watts 34, 1836 WL 2957, *4 (Pa. 1836) ("The intention of the parties is what

all interpretation, where the subject-matter of a contract is lawful, must aim at discovering. . . .  It

is the consenting mind, the concurring thought and will of the parties at the time of the

agreement, that justice is called in to aid and to uphold.")  Such intention may be implied either

from a reading of the entire deed or, if the deed is ambiguous, on "the attending circumstances

existing at the time of the execution [of the deed]."  Stewart, 266 A.2d at 263.

We first examine whether the parties of the Jamieson Deed intended to include sandstone

within the intended definition of the term "mineral."  We then will determine whether the parties

intended to allow the extraction of the sandstone through surface mining.

**1.  The parties of the Jamieson Deed intended sandstone to fall within the Jamieson Deed mineral reservation.**

In the analysis of whether a substance is a "mineral" within the scope of a mineral

reservation, the crucial question is:  "What was the sense in which the parties used the word?"

Silver v. Bush, 62 A. 832, 833 (Pa. 1906); see also Highland v. Commonwealth, 161 A.2d 390,

398 (Pa. 1960).  The term mineral is "not per se a term of art or of trade, but of general language,

and presumably is intended in the ordinary popular sense which it bears among English speaking

people."  Silver, 62 A. at 833.  It may have different meanings depending upon the intention of

the parties; such as a very broad or restricted meaning.  Silver, 62 A. at 833; see also Gibson, 836

WL 2957 at *4 (Pa. 1836) ("The term 'mineral' is not very definite as to its limits"). A mineral has been defined broadly as "everything not of the mere surface, which is used for agricultural purposes; the granite of the mountain as well as metallic ores and fossils, are comprehended within it." Griffin v. Fellows, 81 1/2 Pa. 114, 1873 WL 11950, *9 (Pa. 1873). It can also be defined by evidence of the parties' knowledge of the type of minerals present on the land at the time of conveyance. See Gibson, 1836 WL 2957 at *5, 7 (Court stated "it appears…that both parties… came to the knowledge of the fact that the mineral called chrome…was found on this tract," and combined with the language of the deed, the Court found that chromate was included within the mineral reservation).

A mineral may also be defined in the commercial sense, in which a mineral is "any inorganic substance found in nature, having sufficient value, separated from its situs as part of the earth, to be mined, quarried, or dug for its own sake or its own specific use." Hendler v. Lehigh Valley R.R. Co., 58 A. 486, 487 (Pa. 1904) (overruled on other grounds by Hall v. Delaware, Lackawanna & W. R.R. Co., 113 A. 669 (Pa. 1921)). When the parties intend to define minerals by its commercial sense, substances included within this definition have their own value that is apart from the rest of the land. Hendler, 58 A. at 487.

In Hendler, the Pennsylvania Supreme Court examined whether the parties of a deed conveying land intended common sand to be included within the mineral reservation. Hendler, 58 A. at 487. The deed in Hendler reserved "all coal and other minerals, in, under and upon said land," and the court found that this indicated that the parties intended to include in the mineral reservation substances, like coal, that had their own value apart from the land. Id. The court reasoned that the mineral reservation was not strictly limited to coal simply because it was expressed in the deed, but rather that:

> A vein of pure white quartz sand, valuable for making glass or other special use, would be within the [mineral] reservation, while common mixed sand, merely worth digging and removing as material for grading, would not be…[The common mixed sand] was taken and used, not for any intrinsic value or use of its own, but as part of earth and other material to fill up the roadbed to the proper grade.  So regarded and used, it was not within the reservation.

Id.  The court went on to further state that such substances as granite, limestone, clay, and other building material would also be within a mineral reservation if they had a commercial value.  Id. Therefore, since the sand did not have any commercial value, the court ruled that the parties did not intend to include the sand within the mineral reservation.  Id.

As in Hendler, the language in the Jamieson Deed indicates the parties' intention to include as "minerals" substances that have their own value apart from the land.  Hendler, 58 A. at 487.  The Jamieson Deed reserved "all the oil, natural gas, glass sand and minerals of every kind and description whatsoever." Jamieson Deed at 439.  The specific reservation of oil, natural gas, and glass sand indicates that the parties intended that substances that have commercial value are within the scope of the reservation.  Hendler, 58 A. at 487.  Thus, the critical question is whether "sandstone" has commercial value and is included within the mineral reservation of the Deed.

Unlike the sand in Hendler, sandstone located in the Allegheny National Forest has its own commercial value apart from the land.  Sandstone was regarded as a commercially valuable mineral at the time of the conveyance of the Jamieson Deed.  Pennsylvania's Mineral Heritage: The Commonwealth at the Economic Crossroads of Her Industrial Development (1944), Attachment 10 to Ex. A to Pl.'s Br. Supp. (noting longstanding stone industry in Pennsylvania, including "1.4 million tons of sandstone . . . produced . . . for commercial purposes" in 1930, the same year the Jamieson Deed was executed, at 50-51, and commercial use of sandstone for highway construction, at 156, 193).  The parties of the Jamieson Deed were likely aware of the

commercial value of sandstone, and that sandstone was present on the Jamieson Tract.  As such, we find that since the parties to the Jamieson Deed intended to include commercially valuable minerals within the mineral reservation, and because sandstone was regarded as a commercially valuable mineral at the time of the Jamieson Deed conveyance, sandstone is within the scope of the mineral reservation of the Jamieson Deed.  Therefore, the sandstone at issue in this case belongs to PAPCO.

### 2. The parties intended to include surface mining within the scope of the mineral reservation of the Jamieson Deed.

Pennsylvania law recognizes three estates in land: the surface estate, the mineral estate, and the right to subjacent (surface) support.  Consolidation Coal Co. v. White, 875 A.2d 318, 326 (Pa.Super.Ct. 2005).  When there is a separation of the minerals from the surface, "the owner of the mineral estates owes a servitude of sufficient support to the superincumbent estate."  Smith v. Glen Alden Coal Co., 32 A.2d 227, 235 (Pa. 1943), citing Graff Furnace Co. v. Scranton Coal Co., 91 A. 508 (Pa. 1914).  While the mineral estate owner must support the surface estate, at the same time the mineral owner also has an "absolute right to access and extract their minerals without consent of the surface owner," except as set forth in the deed.  Minard Run Oil Co. v. U.S. Forest Service, 2009 WL 4937785, *23 (W.D. Pa. 2009), citing Chartiers Block Coal Co. v. Mellon, 25 A. 597, 598 (Pa. 1893) and Clearfield Bank & Trust Co. v. Shaffer, 553 A.2d 455, 457-58 (Pa.Super.Ct. 1989).  The mineral rights owner "should reap some benefit and advantage from the exercise and enjoyment" of the privileges contained within the mineral reservation.  Griffin, 1873 WL 11950 at *8.  The mineral owner's rights cannot be diminished or lessened, "nor their reasonable exercise impaired without just compensation," merely because the surface comes to be owned by the government.  Belden & Blake Corp. v. Commonwealth, 969 A.2d 528, 567-68 (Pa. 2009).

Keeping the rights of both the mineral and surface owners in mind the crucial question when determining what type of mining is permitted by a mineral reservation is: What was the intention of the parties at the time of the conveyance? Stewart, 266 A.2d at 263. When dealing with the destruction of a surface area due to surface mining, it is important to note that "no land owner would lightly or casually grant strip mining rights, nor would any purchaser of land treat lightly any reservation of mining rights." Id. An authorization to conduct mining, without more, does not necessarily encompass the right to surface mine. Id. at 264. Thus, the burden lies on the party "who seeks to assert the right to destroy or injure the surface" to show that there is some "positive indication that the parties to the deed agreed to authorize practices" that may result in the destruction of the surface area. Id. When a deed is ambiguous in regards to the parties' intent, "all of the attending circumstances existing at the time of the execution of the instrument" should be considered in the determination of the apparent intent. Id.

### a. The Language of the Jamieson Deed.

The Rules and Regulations section of the Jamieson Deed states in relevant part:

2. In prospecting for, and in mining and removing minerals, oil and gas, and in manufacturing the products thereof, *only so much of the surface shall be occupied, used or disturbed as is necessary for the purpose.*

3. *In underground operations all reasonable and usual precaution shall be made for the support of the surface* and to that and tunnels, shafts and other workings shall be subject to inspection and examination by the Forest Officers, Mining Experts or Inspectors of the United States.

*4.* Payment of the usual rates charges in the locality for sales of National Forest timber, and timber products of the same kind or species shall be made to the United States for all timber, undergrowth or young growth, cut, destroyed or damaged in prospecting, mining, drilling or removing minerals, oil or gas, or in manufacturing products therefrom, and in the location and construction of buildings or works of any kind for the use in connection therewith. All slash resulting from such cutting or destruction shall be disposed of as directed by the Forest Officer, when inflammable in his judgment. *No timber,*

> *undergrowth or reproduction shall be unnecessarily cut, destroyed or damaged.*

Jamieson Deed at 439 (emphasis added).

Defendants contend that because provision 3 of the Rules and Regulations explicitly refers to "underground operations" the parties to the Deed intended that *only* underground mining methods would be permitted within the Jamieson Tract. Thus, Defendants argue that the mineral reservation of the Jamieson Deed does not include the right to surface mine.

We disagree. There is no provision in the Rules and Regulations that explicitly excludes surface mining. When read together, provisions 2, 3, and 4 suggest that the parties expected OGM rights owners to disturb the surface estate in some manner, thereby implying that the parties expected that surface mining would be used. Provision 2 explicitly permits an OGM rights owner to occupy, use, and disturb the surface estate. Similarly, provision 4 explicitly contemplates that timber and other growth on the surface estate may be cut, destroyed, or damaged. The only reasonable reading of the language that imposes reasonable restrictions on the use of the surface estate is that the parties to the Deed contemplated that OGM rights owners would be using surface mining techniques. Provisions 2, 3, and 4 are consistent in that they each set forth reasonable restrictions on the conduct of the OGM rights owners with respect to the surface estate.

To the extent the language of the Deed is ambiguous in this regard, the record evidence also demonstrates "some positive indication that the parties to the deed agreed to authorize" surface mining practices, despite any minimum destruction to the surface. Stewart, 266 A.2d at 264. PAPCO argues, and we agree, that because the Jamieson Deed specifically mentioned glass sand within the mineral reservation, the parties intended to allow for surface mining techniques to be used in the Jamieson Tract. See Stearns, 816 F.2d at 283-84 (proper to consider evidence

whether strip mining was commonly known to the area at the time of the deed when determining whether strip mining rights were within the scope of the mineral reservation). In addition, the historical documents in the record show that surface mining for glass sand was prevalent in the Allegheny area at the time of the Jamieson Deed. Specifically, the <u>Topographic and Geologic Survey of Pennsylvania</u>, published in 1918, states in relevant part:

> At present the glass sand industry is practically confined to two parts of the State, namely: the central portion, and the western part…In this region *glass sand quarries are being operated* in Elk, Fayette, Forest, Jefferson, Venago, Warren and Westmoreland counties.

<u>Topographic and Geologic Survey of Pennsylvania: Glass Manufacture and the Glass Sand Industry</u> 149 (1918), Attachment 13 to Ex. A to Pl's. Br. Supp. (emphasis added). Therefore, surface mining techniques were typically used for the extraction of glass sand and were known in the Allegheny area at the time of the Jamieson Deed.

We determine that a reasonable reading of the Deed language is that the parties contemplated that surface mining may occur. In addition, there is no language in the Rules and Regulations excluding surface mining by OGM rights owners. The specific reference to glass sand in the mineral reservation combined with the historical evidence that surface mining was common in the Allegheny area at the time of the Deed also establishes that surface mining was contemplated by the parties. Accordingly, we find that the parties of the Jamieson Deed intended to permit surface mining by owners of reserved oil, gas, and mineral rights.

### b. The Goals of the Weeks Act.

Defendants also argue that as one of the goals of the Weeks Act was to protect and minimize disturbances to the surface area in order to ensure productive use of the land, the parties to the Jamieson Deed could not have intended to allow surface mining; as such a method would destroy the surface. Defs.' Br. Supp. 21. Thus, Defendants contend that the sandstone

was not included within the mineral reservation of the Jamieson Deed.  For support, Defendants rely upon Downstate Stone Co. v. United States, 712 F.2d 1215 (7th Cir. 1983), and Stearns, 816 F.2d 279.  However, these cases are distinguishable.

In Downstate, the Court noted that "the evidence in the record indicated that uncontrolled limestone quarrying by the mineral owner would preclude productive use of the surface by the United States."  Downstate, 712 F.2d at 1217.  The evidence in the record showed that not only would the limestone quarrying lead to almost a complete destruction of the surface, but the plaintiff's plan to create a recreational lake would involve the leveling of a 900-ft hill.  Id. at 1218.  The Downstate Court relied upon Illinois law in concluding that it was unreasonable to assume that a party would reserve the surface, but at the same time give the mineral rights owner the ability to destroy the surface, or in other words "thereby destroying all he had reserved."  Id.  Thus, the extent of the surface destruction in Downstate, which was widespread and complete, appears to have been a paramount concern.

In contrast, PAPCO's exercise of its mineral rights in this case "would be minimal in comparison with what would have occurred in Downstate."  Pl.'s Reply to Defs.' Resp. Opp. 3.  The record evidence supports that the disturbance to the surface area in this case is not comparable to the destruction in Downstate.  PAPCO points to statistics regarding how much of the surface area in the Allegheny Nation Forest is used for stone pits, *i.e.*, sandstone extraction.  PAPCO states that since the creation of the Allegheny National Forest in 1923, only 1.4% of the Allegheny National Forest lands have been cleared by OGM development, and of that less than 0.22% represents stone pits (this includes all of the pits developed for private oil and gas development, as well as all of the Forest Service activity).  Id. at 12, citing ANF Final Environmental Impact Statement (March 2007) at 3-136.  These statistics do not support the

contention that sandstone stone pits will lead to the complete destruction of the surface as was the case in Downstate, or preclude productive use of the surface by the Defendants.

We further find that the Defendants have not supplied evidence to support their contention that PAPCO's surface mining for sandstone will create just as much, if not more, destruction of the surface as in Downstate, or that there will be uncontrolled surface mining. Pursuant to Pennsylvania law, a mineral rights owner "should reap some benefit and advantage from the exercise and enjoyment" of the privileges contained within the mineral reservation. Griffin, 1873 WL 11950 at *8. PAPCO's conduct with respect to the surface estate is always subject to the Rules and Regulations as prescribed by the Secretary of Agriculture and set forth in the Jamieson Deed, and in addition PAPCO's conduct must comport with a reasonable use under Pennsylvania common law. Therefore, we do not find Downstate controlling.

The Stearns case is also distinguishable from the present case because the Court in that case relied upon Kentucky state law in considering the question "whether the 'parties to the deed intended that the mineral owner's rights to use the surface, in removal of minerals would be *superior to any competing right of the surface owner*.'" Stearns, 816 F.2d at 282 (emphasis added). In the present case we are not considering whether PAPCO's rights are *superior* to the rights of the surface owner, instead we are considering under Pennsylvania law simply whether the parties contemplated strip mining when the Deed was made.

The Stearns Court found that the regulations contained in the deed, which are similar to the Rules & Regulations section in the Jamieson Deed, did not indicate that the parties intended the mineral owner's rights to be *superior* to the right of the surface owner. Id. As such, the Court held that parties did not intend to allow the mineral rights owner to *destroy* the surface, and thus, the mineral rights owner did not have the right to commence strip mining operations.

Id. at 283. The Court also stated that because strip mining techniques were not commonly known to be used in the area of Kentucky when the deed was executed, this provided further support for concluding that the parties did not intend to allow strip mining within the mineral reservation of the deed. Id.

In contrast, in the present case under Pennsylvania law we considered the intention of the parties at the time of the conveyance. We made no determination whether the parties intended the mineral owner's rights to be *superior* to that of the surface owners. Instead, we merely considered the intentions of the parties at the time of the Deed by looking to the language of the Deed, along with the fact that surface mining was common in the area at the time. As discussed above, we find that the parties did not intend to limit the mineral reservation to underground mining, but rather intended to include surface mining within the rights of a mineral owner.

### 3. Conclusion.

We conclude that sandstone is a "mineral" within the mineral reservation of the Jamieson Deed and that PAPCO owns the sandstone. We further find that surface mining is permitted by PAPCO subject to the restrictions in the Deed and Pennsylvania common law. Accordingly, we will grant PAPCO's Motion for Summary Judgment and enter Judgment in its favor on Count I.

### C. PAPCO's Easement

PAPCO also argues that even if this Court does not find that it owns the sandstone pursuant to the mineral reservation in the Jamieson Deed, it nonetheless still has a right to the reasonable use of an easement incidental to PAPCO's mineral reservation to "explore for, mine, and use the sandstone." Pl.'s Br. Supp. 44, citing Dewey v. Great Lakes Coal Co., 84 A. 913 (Pa. 1912)).

As stated above, we find that the sandstone and surfacing mining techniques are included within the mineral reservation of the Jamieson Deed, and as such, PAPCO has ownership and the right to use the stone, which includes the reasonable use of an easement to obtain its oil, gas, and mineral rights.  *See* Dewey, 84 A. 913; Youghiogheny River Coal Co. v. Allegheny Nat'l Bank, 60 A. 924,  (1905); Chartiers, 25 A. at 599 (each mineral rights owner "would have the right, without any express words of grant for that purpose… to go upon the surface…and to occupy so much of the surface…as might be [reasonably] necessary to operate his estate and to remove the product thereof"); Minard Run, 2009 WL 4937785 at *23 ("the mineral estate is the 'dominant' estate and the owner thereof has an absolute right to occupy as much of the surface to access and extract his mineral as necessary"); Babcock Lumber Co. v. Faust, 39 A.2d 298, 303 (Pa.Super.Ct. 1944); and Chartiers, 25 A. at 598 (enjoyment must be "exercised with due regard of the owner of the surface").   Thus, we need not address the issue of whether PAPCO has an easement pursuant to their OGM rights, to use sandstone owned by the Forest Service.

### D.  PAPCO's Request for Declaratory Judgment

Since the Quiet Title Act contains a limited waiver of sovereign immunity it is the exclusive remedy.  Block, 461 U.S. at 286 ("Congress intended the Quiet Title Act to provide the exclusive means by which adverse claimants could challenge the United States' title to real property").  This Act allows a party to "adjudicate a disputed title to real property in which the United States claims an interest."  28 U.S.C. §2409a.  However, allowing a party to maintain a declaratory judgment action would "undermine the policies set forth in Block and would render the Quiet Title Act's statute of limitations meaningless."  Rosette, Inc. v. United States, 141 F.3d 1394, 1397 (10th Cir. 1998).  Thus, if the "request for declaratory relief leads directly back to the

question of title, and as such, is inextricably linked to that question," then the Quiet Title Act is the exclusive remedy. <u>Rio Grande Silvery Minnow</u>, 599 F.3d at n. 4, 1178.

In ¶5 of the Second Amended Complaint, PAPCO stated that "[t]his Court has the authority to issue declaratory judgment orders pursuant to 28 U.S.C. Chapter 151." Am. Compl. at ¶5. PAPCO contends that its "prayers for relief were merely intended to give effect to favorable judgments concerning title and easement issues on Counts I and II," and that it was not "artful pleading intended to assert separate causes of action." Pl.'s Br. Opp. 40-41. While this Court may make a declaratory statement that PAPCO is the rightful owner of the sandstone, we cannot issue a declaratory judgment pursuant to 28 U.S.C. Chapter 151, §§2201-2202.

**IV.    Conclusion**

We find that PAPCO's Quiet Title claim is not barred by the statute of limitations set forth in §2409a(g) and therefore we do have subject matter jurisdiction. As explained above, we find sandstone is a "mineral" within the mineral reservation of the Jamieson deed and therefore PAPCO owns the sandstone. We further find that PAPCO is permitted the reasonable use of an easement to obtain its oil, gas, and mineral rights. Accordingly, summary judgment will be entered in favor of PAPCO and against Defendants.

An appropriate Order will be entered.


_August 30, 2011_
Date

_Maurice B. Cohill, Jr._
Maurice B. Cohill, Jr.
Senior United States District Judge